# UNITED STATES DISTRICT COURT FOR
# THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KIM MILLBROOK, | : | |
| Plaintiff | : | CIVIL ACTION NO. 3:15-CV-0832 |
| | : | (Judge Nealon) |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| Defendant | : | |
| | : | |

## MEMORANDUM

## I.   BACKGROUND

On April 29, 2015, Plaintiff, Kim Millbrook, an inmate currently

incarcerated in the United States Penitentiary, Lewisburg, Pennsylvania ("USP-

Lewisburg"), instituted the above-captioned action by filing a pro se complaint

pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. ("FTCA"),

against Defendant, the United States of America.  (Doc. 1).  Plaintiff alleges that

on March 28, 2013, Lieutenant Johnson and Correctional Officer Stevens

approached Plaintiff's cell and informed Plaintiff that he would be receiving a new

cellmate.  (Id. at p. 5).  Plaintiff allegedly refused his new cellmate because of "a

contract hit out on [his] life by known gang affiliated members and non-members

due to [Plaintiff] being labeled a jailhouse snitch and a homosexual."  (Id. at pp. 5-

6).  He claims that he informed Lieutenant Johnson that "the gangster disciples,

latin kings, District of Colombia (D.C.) members, CMP's and bloods and anyone

[Plaintiff has] been forced to cell with would and has attacked [him] and trying to hurt or kill [Plaintiff] due to a contract hit out on [him]." (Doc. 1, p. 6). Lieutenant Johnson allegedly informed Plaintiff that he "did not care," and that Plaintiff "was still getting a cellmate or [he] would be extracted from the cell and placed into" ambulatory restraints[1] until he accepted a cellmate. (Id.). He states that Lieutenant Johnson and Correction Officer Stevens then left the area, but Lieutenant Johnson returned later with an unknown Lieutenant and the "use of force team . . . ." (Id.). Plaintiff claims he was then told to "cuff up, [and] that [he] was going into ambulatory restraints" because he refused his new cellmate. (Id.). Plaintiff alleges that he complied, but claims he was "hand cuffed excessively tight around [his] wrist area . . . ." (Id.).

According to Plaintiff, he was then:

> taken by use of force team and unknown lieutenant and Lt. Johnson along with medical healthcare employee EMT Barth to a room on the front of F-Block 3rd floor where the use of force team began to strip [him] of [his] clothes and applied the belly chains, hand and leg restraints extremely tight to the point where [Plaintiff] could not breath and where [his] hands, legs and feet lost blood circulation in which [he] complained to EMT Barth, Lt. Johnson and use of force team that [he] was having trouble breathing.

---

[1] Ambulatory restraints are defined by Federal Bureau of Prisons policy as "approved soft and hard restraint equipment which allow the inmate to eat, drink, and take care of basic human needs without staff intervention." (Doc. 1, p. 84).

(Doc. 1, p. 7).  EMT Barth and the Use of Force Team then allegedly told Plaintiff

that "you will learn to do as you are told and maybe this will teach you to do as

you are told . . . ."  (Id.).

Plaintiff alleges that he was taken by the Use of Force Team, Lieutenant

Johnson, an unknown Lieutenant, and EMT Barth to "G-Block Cell 101."  (Id. at

p. 6).  He claims that he was placed in that cell, which had its window closed and a

room temperature of at least a 120 degrees.  (Id.).  Plaintiff states that he

"immediately began to sweat and gasp for air from the poor ventilation and passed

out . . . ."  (Id.).

Plaintiff claims that:

> [a]fter being inside the cell 101 G-Block for awhile [he]
> received a visit from Lt. Johnson and Lt. Knapp . . . [which is
> when Plaintiff] informed them that [he] was in severe pain from
> the restraints being to[o] tight and [he] was having trouble
> breathing due to the belly chains being to[o] tight around [his]
> waist and the poor ventilation inside the cell, also the metal
> pipe that gives off heat from the months of October [through]
> April had the temperature inside the cell [at] 120 degrees . . . .

(Id. at p. 8).  He also alleges that he told "them [he] suffers from high blood

pressure and had passed out already inside the cell and needed to be taken out of

the restraints and the window inside the cell opened so as to let some air inside the

cell."  (Id.).  Additionally, Plaintiff claims he "told them that [he] was being

3

falsely accused and that they were violating BOP policy, procedure and protocol and falsifying government documents by subjecting [him] to tortuous and abusive behavior and needed to remove [him] immediately out of the cell and the restraints." (Doc. 1, p. 8); see (Id. at p. 13). Plaintiff alleges that "Lt. Knapp and Lt. Johnson told [him] that until [he] did what they told [him] to do which is to except (sic) a violent cellmate [he] would stay in restraints inside cell 101 G-Block . . . ." (Id. at p. 8).

Plaintiff claims that he then "received another visit from A.W. Wilson," at which time he claims to have "informed [A.W. Wilson] that [Plaintiff's] life, health and safety are and is in 'imminent danger' at all times at Lewisburg SMU program due to [Plaintiff] being labeled a jailhouse 'snitch' and a homosexual." (Id. at p. 9). He also alleges that he informed A.W. Wilson of the "contract hit out on [Plaintiff's] life by known gang affiliated inmates . . . and also non-members." (Id.). Plaintiff states that he told A.W. Wilson that he "was brought up on false allegations by Lt. Johnson and use of force team and placed in ambulatory restraints unjustly, that due to the restraints being applied to[o] tight Plaintiff was having trouble breathing, also the restraints were cutting off all blood circulation in [his] arms, hands, legs and feet . . . ." (Id.). Plaintiff claims he also informed A.W. Wilson that he was "in severe pain and that the room was to[o] 'hot,' and

4

also [his] feet, fingers, hands, and wrists were swollen and turned blue." (Doc. 1, p. 8). Plaintiff alleges that he also told A.W. Wilson that:

> Lt. Johnson and C.O. Stevens [were] trying to force a violent inmate in the cell with [Plaintiff] on F-Block and [he] refused the inmate to be celled with [him] out of fear for [his] safety due to [him] being attacked and physically and sexually assaulted by violent inmates and staff officials while at Lewisburg SMU program and that [he has] requested protective custody and to be transferred to a safer prison facility . . . .

(Id. at pp. 9-10).

According to Plaintiff, A.W. Wilson stated "that he would not help [Plaintiff] because [he] told [A.W. Wilson] to have [Plaintiff] removed from the ambulatory restraints and from the cell that was 120 degrees . . . ." (Id. at p. 10). Plaintiff alleges that A.W. Wilson then stated that Plaintiff "needed to remember that [he] was in Lewisburg and we do what we want to around here, that he does not believe his staff officials would make up fake incident reports against [Plaintiff] and even if it was true, who do you think I'm going to believe." (Id.). According to Plaintiff, A.W. Wilson then "said that he would believe the staff before he would believe [Plaintiff] anyday." (Id.). He claims that A.W. Wilson also stated that he knew who Plaintiff "was and for [him] to stop filing lawsuits and admin. remedies on staff and inmates here at Lewisburg, and from now on A.W. Wilson was going to be keeping a close eye on" Plaintiff. (Id. at pp. 10-11).

Plaintiff claims that this interaction was witnessed by "an inmate 'Black' whom was forced into the cell with [Plaintiff] and told by Lt. Knapp and A.W. Wilson that Plaintiff was 'a rat' and to beat [Plaintiff] up." (Doc. 1, p. 11).

Plaintiff also claims that on the evening of March 28, 2013, cell 101 on G-Block was "infested with bugs like roaches, and rodents like rats and mice . . . ." (Id.). Also during that time, Plaintiff states that "the heat inside the room was 120 degrees . . . without any air flow . . . [and he was] still in extremely tight leg and hand restraints, and belly chain around waist [which] cut[] off [his] air supply to the point where Plaintiff passed out and had to be revived by a EMT-George on evening watch . . . ." (Id.). Plaintiff alleges that EMT-George told him "in front of a Lt. Carwascillo [that he] should've let [Plaintiff] die for all the trouble [he has] caused around here filing all the lawsuits against Lewisburg staff like EMT-Potter, EMT-Walls, and Doctor Pigos who I work with and are good friends of mine . . . ." (Id.). Plaintiff claims that he "told EMT-George and Lt. Carwascillo that [he] needed to be taken out of ambulatory restraints, . . . the window inside the cell needed to be opened to let some air flow into the room as to cool the room due to the extreme heat and to unchain the belly chain from around [Plaintiff's] waist and chest area . . . ." (Id.). He states that these requests were refused. (Id.). Instead, Plaintiff alleges, "EMT-George began pulling on [Plaintiff's] wrists and

hands to inflict severe pain and in a hurtful manner . . . ." (Doc. 1, p. 11).

Also during the evening of March 28, 2013, Plaintiff alleges that "EMT-Potter came in with Lt. Dawkins into cell 101 G-Block and Plaintiff informed them to remove the leg and hand restraints also the belly chain so that [he] could breath but they refused." (Id.). According to Plaintiff, "Lt. Dawkins began acting like he was going to loosen the restraints but instead tightened them around [Plaintiff's] hands and wrists thus inflicting severe pain . . . ." (Id.). Plaintiff was removed from his restraints on March 29, 2013. (Id. at p. 13).

Plaintiff claims that he "suffered from permanent nerve damage from these abusive attacks like tendinitis, permanent scarring around wrist and ankles, numbness, mental and emotional scarring for life and in constant pain at all times, suffering from symptoms of arthritis and joint pain and taking medication called Meloxicam 7.5 mg, also suffering symptoms from PTSD (post traumatic stress disorder) like nightmares, panic attacks, paranoia, suicidal tendencies . . . ." (Id.).

On July 6, 2015, Defendant filed a motion for summary judgment, statement of facts, and brief in support. (Docs. 13-15). On August 18, 2015, Plaintiff filed his brief in opposition, declaration, statement of disputed facts, and exhibits. (Docs. 18-21). Defendant did not file a reply, and the time for filing such has passed. See M.D. Pa. L.R. 7.7. Therefore, Defendant's motion for summary

judgment is ripe for disposition.  For the reasons stated below, Defendant's motion will be granted in part and denied in part.

## II.   <u>STANDARD OF REVIEW</u>

Pursuant to Federal Rule of Civil Procedure 56(a) "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); <u>see</u> <u>also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law.  <u>Id.</u> at 248; <u>Gray v. York Newspapers, Inc.</u>, 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  <u>Anderson</u>, 477 U.S. at 257; <u>Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.</u>, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, generally, the court must view the facts and all reasonable inferences in favor of the nonmoving party.  Moore v. Tartler, 986 F.2d 682, 685 (3d Cir. 1993); Clement v. Consol. Rail Corp., 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988).  In order to avoid summary judgment, however, parties may not rely on unsubstantiated allegations. Parties seeking to establish that a fact is or is not genuinely disputed must support such an assertion by "citing to particular parts of materials in the record," by showing that an adverse party's factual assertion lacks support from cited materials, or demonstrating that a factual assertion is unsupportable by admissible evidence.  FED. R. CIV. P. 56(c)(1); see Celotex, 477 U.S. at 324 (requiring evidentiary support for factual assertions made in response to summary judgment). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986).  Parties must produce evidence to show the existence of every element essential to its case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323; see Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992).

Failure to properly support or contest an assertion of fact may result in the fact being considered undisputed for the purpose of the motion, although a court may also give parties an opportunity to properly provide support or opposition.  FED. R. CIV. P. 56(e).  Moreover, "at the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder."  Boyle v. Cnty. of Allegheny Pa., 139 F.3d 386, 393 (3d Cir. 1998).

## III.   **STATEMENT OF FACTS**

From the pleadings, declarations and exhibits submitted therewith, the following facts can be ascertained as undisputed:

On March 28, 2013, the acting Warden authorized the Use of Force Team to remove Plaintiff from his cell.  (Doc. 14, p. 3); (Doc. 20, p. 4).  The Use of Force team was assembled and confrontation avoidance procedures were initiated with positive results.  (Id.).  Plaintiff voluntarily exited his cell and submitted to cuffs. (Id.).  Plaintiff was then removed from the cell and escorted to a landing area. (Id.).  Once at the landing area, Plaintiff was visually searched, metal detected, medically assessed, given new clothes, and placed into ambulatory restraints. (Doc. 14, pp. 3-4); (Doc. 20, p. 4).  Plaintiff remained in ambulatory restraints from 1:10 p.m. on March 28, 2013, until 8:00 a.m. on March 29, 2013.  (Doc. 14, p. 4); (Doc. 20, p. 5).

While Plaintiff was in ambulatory restraints, BOP Health Services performed a number of clinical encounters.  (Doc. 14-1, pp. 26-28) (Doc. 20, pp. 4-5); (Doc. 19, pp. 10-11).  On March 28, 2013, at 1:17 p.m., EMT Matthew Barth assessed Plaintiff in relation to his placement into ambulatory restraints.  (Doc. 14-1, p. 27).  At 4:00 p.m., EMT George conducted a clinical encounter with Plaintiff.  (Doc. 1, p. 27).  At 8:00 p.m., EMT Potter performed a clinical encounter.  (Id. at p. 24).  At 12:01 a.m. on March 29, 2013, EMT Potter performed another clinical encounter.  (Id. at p. 21).  At 8:00 a.m., Plaintiff was released from the ambulatory restraints.  (Doc. 14-1, p. 30).

On March 28, 2013, a Report of Incident was completed by "Acting Warden, D. Wilson."  (Id. at pp. 19-23).  Plaintiff was charged with violating Code 203 for threatening another with bodily harm and Code 307 for refusing an order when he failed to voluntarily take a cellmate or submit to restraints to allow a cellmate to enter his cell.[2]  (Doc. 14, p. 4); (Doc. 20, p. 5).  On April 22, 2013, Plaintiff appeared before the Disciplinary Hearing Officer.  (Doc. 14, p. 5); (Doc. 20, p. 5).  The Disciplinary Hearing Officer found Plaintiff guilty of threatening another with bodily harm.  (Doc. 14, p. 5); (Doc. 14-1, pp. 6, 36); (Doc. 20, p. 6).

---

[2] 28 C.F.R. § 541.3 contains a listing of the various prohibited acts within the Bureau of Prisons system.

11

Plaintiff's sanctions included disallowance of twenty-seven (27) days good conduct time.  (Doc. 14, p. 5); (Doc. 14-1, pp. 6, 36); (Doc. 20, p. 6).  This disciplinary action has not been overturned.  (Id.).

On May 29, 2013, F. Alama, had a sick call/triage encounter with Plaintiff.  (Doc. 21, p. 4).  Plaintiff presented with complaints of pain in both wrists "due to previous ambulatory restraints."  (Id.).  He also complained of an aching pain in his right wrist that reached level four (4) of ten (10).  (Id.).  Alama noted that Plaintiff had an anxious affect, and appeared "well, NAD, WD/WM, alert and oriented x 3," but also appeared in pain.  (Id.).  Alama found that Plaintiff's "wrist/hand/fingers" had full range of motion in his wrists and were symmetric.  (Id. at p. 5).  Alama also noted that they were tender.  (Id.).  Alama did not observe swelling, erythema or decreased range of active motion in Plaintiff's "wrist/hand/ fingers."  (Id.).  Plaintiff exhibited wrist flexion, extension and pronation, as well as thumb extension.  (Id.).  Alama assessed Plaintiff as having a wrist "sprain and strain" that was "Temporary/Acute."  (Id.).  Alama ordered that Plaintiff be prescribed Meloxicam Tablets, that he could take two (2) times a day for "30 day(s)–Take 1 tablet by mouth daily # 30."  (Id.).  Plaintiff was instructed to follow up at sick call as needed and to return to sick call if his condition did not improve.  (Id.).  Alama also noted that Plaintiff was counseled as to his access to

care, to which Plaintiff verbalized his understanding.  (Doc. 21, p. 5).

On July 9, 2013, Alama performed an "Admin Note encounter" with

Plaintiff.  (Id. at p. 6).  Plaintiff requested a refill of his "Meloxicam" prescription.

(Id.).  Alama ordered that Plaintiff receive a refill of his Meloxicam "7.5 MG Tab"

and that he take "one tablet by mouth each day x 30 day(s)–#30."  (Id.).

While the Court was able to find some undisputed facts, the summary

judgment record also contains the following factual disputes:  1) whether Plaintiff

became disruptive in his cell on March 28, 2013; 2) whether Plaintiff was

medically assessed and found to have no injuries after being removed from his

cell; and 3) whether the ambulatory restraints placed on Plaintiff were excessively

tight and caused Plaintiff to suffer injuries.

First, in regards to whether Plaintiff became disruptive in his cell on March

28, 2013, Defendant asserts that "[a]t approximately 12:15 p.m. on March 28,

2013, [Plaintiff] became disruptive on F Block stating he would violently assault

any inmate who was placed into the cell or any staff member who entered the

cell."  (Doc. 14, p. 3).  Plaintiff claims that at 12:15 p.m., on March 28, 2013, he

did not become disruptive in his cell nor did he state that he would "violently

assault any inmate who was placed into the cell or any staff member who entered

the cell."  (Doc. 20, p. 3).

Second, as to whether Plaintiff was medically assessed without injuries and escorted to a new cell, Defendant asserts that Plaintiff "was removed from the cell and escorted to the landing area where he was visually searched, metal detected, placed in new clothes and ambulatory restraints were applied." (Doc. 14, pp. 3-4). Defendant continues by stating that Plaintiff "was medically assessed–with no injuries–and escorted to a new cell." (Id. at p. 4). Plaintiff disputes the assertion that the was "medically assessed–without injuries–and escorted to a new cell." (Doc. 20, p. 4).

Third, there is a dispute as to whether the ambulatory restraints placed on Plaintiff were excessively tight and caused him injuries. First, Plaintiff's medical records discussed above indicate that Plaintiff's restraints were not excessively tight, but could move freely. (Doc. 1, pp. 21-31, 33). However, Plaintiff contends that his ambulatory restraints were applied "extremely tight to the point where [he] could not breath and where [his] hands, legs and feet lost blood circulation in which [he] complained to EMT-Barth, Lt. Johnson and Use of Force Team that [he] was in severe pain and [he] was having trouble breathing." (Doc. 19, p. 5); see (Doc. 20, pp. 5-8, 10-12). Plaintiff claims that once he was placed into the temporary cell, he continued to experience trouble breathing and pain from the restraints. (Id. at pp. 5, 8, 10, 11); see (Doc. 20, pp. 5-8, 10-12). Additionally,

14

Plaintiff declares that he continues to suffer a number of injuries that he claims

were caused by the excessively tight restraints.  (Doc. 19, p. 12); <u>see</u> (Doc. 20, pp.

11-12).

## IV.   <u>DISCUSSION</u>

"The FTCA provides a limited waiver of immunity for actions in tort against

the United States for the actions or negligence of employees of the government."

<u>Priovolos v. F.B.I.</u>, 2015 U.S. App. LEXIS 19504, at *4 (3d Cir. 2015) (citing 28

U.S.C. §§ 2674, 2675(a)).  "Under the FTCA, sovereign immunity is waived

against persons suing the federal government for the commission of various torts."

<u>Ruiz v. United States</u>, 2016 U.S. Dist. LEXIS 37961, at *5 (M.D. Pa. Mar. 23,

2016) (Conaboy, J.) (citing <u>Simon v. United States</u>, 341 F.3d 193, 200 (3d Cir.

2003)).  "Specifically, the FTCA gives district courts jurisdiction over civil actions

against the United States for 'personal injury or death caused by the negligent or

wrongful act or omission of any employee of the Government while acting within

the scope of his office or employment,' if a private person would be liable to the

claimant for the same."  <u>Tsosie v. United States</u>, 2015 U.S. Dist. LEXIS 145283,

at *10 (M.D. Pa. 2015) (Caputo, J.) (quoting 28 U.S.C. § 1346(b)(1)).  "The

Supreme Court of the United States has interpreted that statute to mean that 'the

United States waives sovereign immunity "under circumstances" where local law

would make a "private person" liable in tort.'" Tsosie, 2015 U.S. Dist. LEXIS 145283, at *1 (quoting United States v. Olson, 546 U.S. 43, 44 (2005)).  Here, Plaintiff's claim arose in Pennsylvania and thus, "Pennsylvania substantive law applies." Id. (citing Toole v. United States, 588 F.2d 403, 406 (3d Cir. 1978)).

 "In Pennsylvania, to prevail in a negligence action, a plaintiff must demonstrate the following elements: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) a causal relationship between the breach and the resulting injury suffered by the plaintiff; and (4) actual loss suffered by the plaintiff." Id. at *11 (citing Merlini ex rel. Merlini v. Gallitzin Water Auth., 602 Pa. 346, 354 (Pa. 2009)).  "However, in cases such as this which involve federal prisoners, it has been recognized that the government's duty of care is one of ordinary diligence." Ruiz, 2016 U.S. Dist. LEXIS 37961, at *6 (citing 18 U.S.C. § 4042; Turner v. Miller, 679 F. Supp. 411, 443 (M.D. Pa. 1987)).  "The applicable law with respect to the burden and quantum of proof under the FTCA remains that of the state in which the alleged tortious conduct occurred." Id. (citing Hossic v. United States, 682 F. Supp. 23, 25 (M.D. Pa. 1987)).  "Under Pennsylvania law, a plaintiff is required to show that the defendant's negligence was the proximate cause of his injury by a preponderance of the evidence." Id. (citing Baum v. United States, 541 F. Supp. 1349, 1351 (M.D. Pa. 1982)).

In addition to his claims of negligence, Plaintiff also advances claims of assault and battery.  (Doc. 1, pp. 2, 6-9, 12).  "As the Pennsylvania Superior court explained in <u>Cohen v. Lit Bros.</u>, 166 Pa. Super. 206, 70 A.2d 419, 421 (Pa. Super. Ct. 1950), 'assault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person.'" <u>Banks v. Harrison</u>, 2015 U.S. Dist. LEXIS 111465, at *19 (M.D. Pa. 2015) (Mannion, J.) (quoting <u>Cohen</u>, 166 Pa. Super. at 209); <u>see</u> <u>Renk v. City of Pittsburgh</u>, 537 Pa. 68, 76 (1994) (citing <u>Cohen</u>, 166 Pa. Super. at 209); <u>see also</u> <u>Zimmerman v. Schaeffer</u>, 654 F. Supp. 2d 226, 255 (M.D. Pa. 2009) (Rambo, J.) ("Under Pennsylvania law, an assault occurs when one acts with the intent to place another in reasonable and immediate apprehension of harmful or offensive contact, and that act does cause such apprehension.  A battery is an intentional offensive bodily contact.") (internal citations omitted).  Additionally, the Pennsylvania Superior Court has stated that "[t]hreatening words alone are insufficient to put a person in reasonable apprehension of physical injury or offensive touching; rather the actor must be in a position to carry out the threat immediately and must take some affirmative action to do so."  <u>Paves v. Corson</u>, 765 A.2d 1128, 1138 (Pa. Super. Ct. 2000) (citing <u>Gen. Mach. Corp. v. Feldman</u>,

507 A.2d 831, 833-34 (Pa. Super. Ct. 1986)), <u>rev'd in part on other grounds</u>, 569

Pa. 171 (2002)); <u>see</u> <u>Patel v. Patel</u>, 2015 U.S. Dist. LEXIS 149571, at *7 (E.D. Pa.

2015) ("Words alone, no matter how threatening, do not constitute an assault . . .

."); <u>Brillhart v. Sharp</u>, 2008 U.S. Dist. LEXIS 55624, at *19 (M.D. Pa. 2008)

(Jones, J.) (citing <u>Cucinotti v. Ortmann</u>, 399 Pa. 26 (Pa. 1960); <u>Paves</u>, 765 A.2d at

1138; <u>Sides</u>, 648 A.2d at 796).

 Assault and battery are intentional torts in Pennsylvania.  <u>See</u> <u>Cooper ex rel.</u>

<u>Cooper v. Lankenau Hosp.</u>, 616 Pa. 550, 563 (2012) (citing <u>Valles v. Albert</u>

<u>Einstein Med. Ctr.</u>, 569 Pa. 542 (2002)); <u>Am. Nat'l Prop. & Casualty Cos.</u>, 93

A.3d 880, 886-87 (Pa. Super. Ct. 2014).  "The FTCA waives the United States'

sovereign immunity for certain intentional torts committed by law enforcement

officers."  <u>Millbrook v. U.S.</u>, 133 S. Ct. 1441, 1444 (2013).  The relevant portion

of the Act, 28 U.S.C. § 2680(h), which is known as the "intentional torts

exception," states:

> The provisions of this chapter and section 1346(b) of this title
> shall not apply to– . . . .
>
> > (h) Any claim arising out of assault, battery, false
> > imprisonment, false arrest, malicious prosecution, abuse
> > of process, libel, slander, misrepresentation, deceit, or
> > interference with contract rights: Provided, That, with
> > regard to acts or omissions of investigative or law
> > enforcement officers of the United States Government,

> the provisions of this chapter and section 1346(b) of this
> title shall apply to any claim arising . . . out of assault,
> battery, false imprisonment, false arrest, abuse of
> process, or malicious prosecution.

28 U.S.C. § 2680(h).  The Supreme Court of the United States held that "the

waiver effected by the law enforcement proviso extends to acts or omissions of

law enforcement officers that arise within the scope of their employment,

regardless of whether the officers are engaged in investigative or law enforcement

activity, or are executing a search, seizing evidence, or making an arrest."

Millbrook, 133 S. Ct. at 1446.

### A.      Miller v. United States

Defendant argues that Miller v. United States, 2014 U.S. Dist. LEXIS

157059 (M.D. Pa. 2014) (Mannion, J.), supports the entry of judgment in

Defendant's favor as to all of Plaintiff's claims because "any claim . . . raising

challenges to the DHO's imposition of sanctions or the procedures used in

reaching those conclusions must be dismissed for [Plaintiff's] failure to first

successfully challenge the procedures employed and the ultimate decision by way

of a habeas petition . . . ."  (Doc. 15, pp. 5-8).  As discussed in more detail below,

Miller does not lend support to this position.

In Miller, the district court initially addressed the plaintiff's FTCA claim

and found that it did not have jurisdiction to hear that claim because it was unexhausted.  Miller, 2014 U.S. Dist. LEXIS 157059, at *14-15.  In particular, the district court found that it lacked jurisdiction because the plaintiff's "completion of the BOP's administrative remedy process set forth at 28 C.F.R. § 542, et seq., [did]  not satisfy the exhaustion requirements of the FTCA."  Id. at *14.

The district court then addressed the claims based on the plaintiff's disciplinary proceedings.  Id. at *15.  The court noted that "[t]he sanctions levied against [the plaintiff] were all imposed as a result of prison misconduct."  Id.  "As such," the court  determined, "any claim for monetary damages regarding [the plaintiff's] disciplinary hearing is barred under Heck v. Humphrey, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994) and Edwards v. Balisock, 520 U.S. 641, 117 S. Ct. 1584, 137 L. Ed. 2d 906 (1997)."  Id.  The court went on to state that "[a] prisoner cannot bring an action for monetary damages against prison officials relating to procedural errors in a disciplinary proceeding when a judgment in favor of the inmate would necessarily imply the invalidity of the disciplinary hearing, unless the inmate can demonstrate that the disciplinary finding has previously been invalidated."  Id.  Finding no evidence that the plaintiff's disciplinary sanctions had "ever been called into question, or overturned," the district court determined that the defendant was entitled to summary judgment because the

plaintiff's claims based on the disciplinary proceedings were "barred by Heck and Edwards." Miller, 2014 U.S. Dist. LEXIS 157059, at *15.

Defendant contends that the second determination in Miller provides support for the entry of judgment in favor of Defendant as to all of Plaintiff's claims. (Doc. 15, pp. 5-8). However, this determination in Miller, at most, supports a finding that to the extent a plaintiff is seeking monetary redress in the form of a claim regarding a disciplinary proceeding that has not been overturned or invalidated, judgment will be entered in favor of the defendant. Miller, 2014 U.S. Dist. LEXIS 157059, at *14-15; see Butcher v. United States, 2007 U.S. Dist. LEXIS 55002, at *10 (M.D. Pa. 2007) (Conner, J.) (dismissing claim seeking "monetary damages due to the negligent procedure employed" in the plaintiff's disciplinary proceeding because "an adjudication in [the plaintiff's] favor on the FTCA would implicate the continued validity of his prison disciplinary conviction and sanctions and would fly in the face of this Court's prior determination regarding the validity of that conviction."). Therefore, to the extent that Plaintiff is seeking monetary damages for a due process claim arising out of his disciplinary proceeding that has not been overturned or invalidated, Defendant is entitled to judgment.

However, accepting Defendant's application of Miller, specifically that a

determination in Plaintiff's favor regarding the FTCA claims at issue would

necessarily imply the invalidity of his April 22, 2013 disciplinary conviction,

would be error.  In particular, on March 28, 2013, Plaintiff allegedly refused his

new cell mate and stated that he would "cut off anyone's head that comes in" to

his cell.  (Doc. 14-1, pp. 22, 25, 30).  As a result of these actions, Plaintiff was

charged with failing to follow orders and threatening another with bodily harm.

(Id. at pp. 35-36).  On April 28, 2013, the Disciplinary Hearing Officer ("DHO")

found Plaintiff was guilty of threatening another with bodily harm.  (Id. at pp. 36-

37).

      While the threat underlying the DHO's determination served, at least in part,

as the basis for the application of the ambulatory restraints, it was only after

"confrontational avoidance was utilized with positive results" and Plaintiff

voluntarily left his cell that the alleged excessive force initially was used on

Plaintiff.  (Doc. 14, p. 2); (Doc. 15, p. 4).  Furthermore, Plaintiff also claims that

after he was removed from his cell, taken to a landing area, and placed into a

holding cell, he again was the victim of negligent and intentional torts.  (Doc. 1, p.

12); see (Doc. 19, p. 11).  Therefore, a finding in Plaintiff's favor on his FTCA

claims that arose from when he was initially placed into restraints immediately

after he voluntarily exited his cell until the ambulatory restraints were removed the

next day would not necessarily call into question whether Plaintiff made the underlying threat to harm another person.  As such, Defendant is not entitled to summary judgment on the argument that pursuant to <u>Miller</u>, a determination in Plaintiff's favor regarding his FTCA claims would necessarily imply the invalidity of his April 22, 2013 disciplinary conviction.  Therefore, the Court will address Plaintiff's remaining claims.

## B. <u>Plaintiff's Remaining Claims</u>

As an alterative to its argument based on <u>Miller</u> and <u>Heck</u>, Defendant contends that Plaintiff's "claims of assault and battery still fail because 'the incidental and necessary touchings by correctional officers of inmates in the performance of their duties are not batteries, but are privileged contacts.'"  (Doc. 15, p. 8 n.2) (quoting Restatement (Second) of Torts § 132, Comment b (1965); citing <u>Pircariello v. Fenton</u>, 491 F. Supp. 1026, 1038 (M.D. Pa. 1980)).  Defendant continues by arguing that "[t]he placement of restraints on an inmate is privileged if that conduct was reasonably necessary in the circumstances."  (<u>Id.</u>) (citing Restatement (Second) of Torts § 132, Comment b).  According to Defendant, "[t]he record reflects that the use of restraints was 'reasonably necessary in the circumstances' because [Plaintiff] initially refused to follow staff orders and threatened staff with bodily injury."  (<u>Id.</u> at pp. 8-9 n.2) (citing Doc. 14, p. 4).

23

Defendant continues by asserting that "'a correctional officer is privileged to use reasonable force necessary to carry out his duties and that amount of force when applied to a prisoner is not tortious.'" (Doc. 15, p. 9 n.2) (quoting <u>Fenton</u>, 491 F. Supp. at 1026). "Reasonableness," Defendant contends, "is determined at the time the inmate is placed in restraints." (<u>Id.</u>) (citing <u>Fenton</u>, 491 F. Supp. at 1026). According to Defendant, Plaintiff "states he submitted to the initial application of restraints once the use of force team arrived," and "attaches medical records evidencing the restraint checks that further show that he remained in restraints because he continued to curse and threaten staff." (<u>Id.</u>). "Thus," Defendant concludes, "correctional officers did not commit assault and battery upon [Plaintiff] because placing [him] in restraints and keeping him in them for 19 hours was necessary and reasonable to carry out their duties." (<u>Id.</u>).

In support of its motion, Defendant has supplied the following exhibits: a declaration of Michael S. Romano; Plaintiff's inmate discipline history; Form 583 Report of Incident; a March 28, 2013 memorandum from Operations Lieutenant G. Vargeson; documentary evidence of Plaintiff's March 28, 2013 clinical encounter; Form 586, After Action Review Report; Incident Report No. 2426028; and DHO Report for Incident Report No. 2426028. (Doc. 14-1).

In opposition to Defendant's motion, Plaintiff relies almost entirely on his

sworn declaration to support his version of the events surrounding his placement into restraints shortly after his cell extraction.  See (Doc. 19, pp. 4-5).  While Plaintiff's declaration amounts to little more, if any, than a recitation of the allegations in his complaint, see (Doc. 1, pp. 6-7); (Doc. 18, pp. 2-4); (Doc. 19, pp. 4-5), it is "an admissible form of evidence used to support factual positions during summary judgment."  Shelton v. Bledsoe, 522 F. App'x 109, 112 (3d Cir. 2013) (per curiam) (citing FED. R. CIV. P. 56(c)).  The United States Court of Appeals for the Third Circuit has "consistently said that a pro se inmate, like [Plaintiff], 'is in a decidedly difficult position from which to generate record evidence' and that affidavits 'are about the best that can be expected' at the summary judgment stage."  Id. (quoting Brooks v. Kyler, 204 F.3d 102, 108 n.7 (3d Cir. 2000); citing Smith v. Mensinger, 293 F.3d 641, 649 n.4 (3d Cir. 2002)).  Thus, the Court must accept the declaration as an admissible form of evidence used to support Plaintiff's factual positions.

Generally, a court must take the facts in the light most favorable to the non-moving party when disposing of a summary judgment motion.  However, a "limited exception" to this general rule exists where the non-movant's version of the events may be disregarded to the extent those facts are "blatantly contradicted" by the summary judgment record.  See Scott v. Harris, 550 U.S. 372, 380 (2007)

("when opposing parties tell two different stories, one of which is blatantly

contradicted by the record, so that no reasonable jury could believe it, a court

should not adopt that version of the facts for purposes of ruling on a motion for

summary judgment.").  While video footage has been found to establish this

"limited exception," not all video footage or mechanical depictions will allow a

court to disregard the non-movant's version of the events.  See Scott, 550 U.S. at

380; but see Patterson v. City of Wildwood, 354 F. App'x 695, 697-98 (3d Cir.

2009) ("courts have declined to apply the limited exception set forth in Scott v.

Harris where a videotape or other mechanical depiction does not capture the whole

incident or the entire arrest, or where the videotape or mechanical depiction is

susceptible to multiple reasonable interpretations."); Mills v. City of Harrisburg,

598 F. Supp. 2d 544, 552 n.5 (M.D. Pa. 2008) (Conner, J.) (audio recordings at

issue did not qualify for the exception created by Scott because they were

susceptible to "multiple reasonable perspectives.").  Here, the summary judgment

record is currently devoid of the type of evidence that is capable of blatantly

contradicting Plaintiff's version of the events so that no reasonable jury could

believe it.[3]  Therefore, the facts presented in Plaintiff's sworn declaration are taken

---

[3]  As discussed in more detail below, while the current summary judgment record does
not contain the type of evidence that would allow for the application of the limited exception
established in Scott, there is an indication that arguably dispositive video evidence may exist, but

as true and every inference will be taken in Plaintiff's favor.

Initially, the Defendant's alternative argument in favor of summary judgment is explicitly directed at Plaintiff's intentional tort claims. (Doc. 15, pp. 8-9 n.2). Therefore, Plaintiff's negligence claims will proceed at this stage of the litigation.

As for Plaintiff's assault and battery claims, it is determined that judgment will be entered in Defendant's favor to the extent that Plaintiff advances such claims against non-law enforcement officers EMT Barth and EMT George. See (Doc. 1, pp. 7, 12). Intentional tort claims under the FTCA against non-law enforcement officers are barred by 28 U.S.C. § 2680(h). McLean v. United States, 2016 U.S. Dist. LEXIS 16706, at *6 n.6 (M.D. Pa. Feb. 11, 2016) (Rambo, J.); see Priovolos, 2015 U.S. App. LEXIS 19504, at *4 (citing 28 U.S.C. § 2680(h); Millbrook, 133 S. Ct. at 1446). Consequently, summary judgment will be entered in Defendant's favor as to Plaintiff's intentional tort claims against EMT Barth and EMT George.

In regards to the remaining intentional torts advanced by Plaintiff, he claims that he was the victim of assault and battery shortly after being removed from his cell, (Doc. 1, pp. 6-7), and then a victim of assault and battery again while he was

---

has not been supplied to the Court for review. See (Doc. 14-1, pp. 21, 30).

temporarily housed in a holding cell.  (Doc. 1, pp. 7-8, 12-13).

"While corrections officers have the authority to use necessary force under appropriate circumstances, the reasonableness of this force in relation to their employment duties determines whether particular conduct is considered an assault and battery." Tejada v. Dale, 2015 U.S. Dist. LEXIS 132354, at *16 (E.D. Pa. 2015) (citing Picariello, 491 F. Supp. at 1038 (determining that "necessary touchings by correctional officers of inmates in the performance of their duties are not batteries, but privileged contacts.")).  Moreover, while "the court found in Picariello that the incidental and necessary touching of inmates by correctional officers in the course of their professional duties did not constitute an assault or battery, such a finding can only be made if the officers were in fact acting appropriately within the course of carrying out their professional duties." Saucedo-Gonzalez v. United States, 2007 U.S. Dist. LEXIS 59750, at *24-25 n.11 (W.D. Va. 2007) (determining that Picariello "does not support the government's contention that disputed issues of fact regarding excessive force claim may be resolved at summary judgment"), adopted by, 2007 U.S. Dist. LEXIS 70196.

Here, Plaintiff declares under penalty of perjury that after he voluntarily exited his cell he "was hand cuffed excessively tight around [his] wrist area . . . ." (Doc. 19, p. 4).  According to Plaintiff, he was then "taken by [the] use of force

team[, ] unknown lieutenant, and Lt. Johnson along with medical employee EMT-Barth to a room [in] front of F-Block 3rd Floor . . . ." (Doc. 19, p. 5).  Plaintiff declares that while he was in that room he was stripped of his clothes and placed into "belly chain, hand and leg restraints" that were "extremely tight to the point where [he] could not breath and where [his] hands, legs and feet lost blood circulation . . . ." (Id. at p. 5).  According to Plaintiff, he then "complained to EMT Barth, Lt. Johnson and Use of Force Team that [he] was in severe pain and [he] was having trouble breathing." (Id.).  He states under penalty of perjury that "EMT Barth, Lt. Johnson, and Use of Force Team said 'you will learn to do as you are told and maybe this will teach you to do as you are told' . . . ." (Id.).  Plaintiff also declares that he was "escorted" to "G-Block Cell 101 . . . where the window was completely closed and the room temperature was at least 120 degrees . . . ." (Id.).  Plaintiff states he "immediately began to sweat and gasp for air from the poor ventilation and passed out . . . ." (Id. at p. 6).

Furthermore, while he was held in "G-Block Cell 101," Plaintiff declares that he was visited by "A.W. Wilson." (Id. at pp. 7-9).  During that visit, Plaintiff states that another inmate was "forced into the cell with [Plaintiff] and told by Lt. Knapp and A.W. Wilson that Plaintiff was a 'rat' and to beat [him] up." (Id. at p. 9).  He also declares that during the "evening watch" on March 28, 2013, EMT

Potter and Lt. Dawkins entered "Cell 101 G-Block." (Doc. 19, p. 11). According to Plaintiff, "Lt. Dawkins began acting like he was going to loosen the restraints but instead tightened them around [Plaintiff's] hands and wrists thus inflicting severe pain . . . ." (Id.).

Viewing the facts and taking all reasonable inferences in favor of the Plaintiff, it is determined that there are genuine issues of material fact as to Plaintiff's remaining intentional tort claims. Consequently, Defendant's motion for summary judgment as to those claims will be denied.

While Defendant's motion will be denied in part based on the current summary judgment record, there is an indication in Defendant's documentary evidence that there is arguably dispositive videotape footage of the underlying incident(s) which has not been submitted to the Court. See (Doc. 14-1, pp. 21, 30). Therefore, Defendant will be afforded a further opportunity to seek summary judgment on Plaintiff's remaining claims within thirty (30) days of the date of this Memorandum and accompanying Order. See Hill v. Lappin, 2012 U.S. Dist. LEXIS 132414, at *14-17 (M.D. Pa. 2012) (Conaboy, J.).

## V.   **CONCLUSION**

Based on the foregoing, Defendant's motion for summary judgment, (Doc. 13), will be granted in part and denied in part. Defendant's motion for summary

judgment is granted with respect to any of Plaintiff's claims seeking monetary damages for a due process claim arising out of his disciplinary proceeding that has not been overturned or invalidated and the intentional tort claims advanced against EMT Barth and EMT George.  Defendant's motion for summary judgment is denied as to Plaintiff's negligence claims and remaining intentional tort claims. Additionally, the parties will be afforded thirty (30) days from the date of this Memorandum and accompanying Order to file summary judgment motions as to any of the remaining claims.

A separate Order will be issued.

**Date**: September 12, 2016                         /s/ William J. Nealon
                                                      **United States District Judge**