## UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF PENNSYLVANIA

KIM MILLBROOK,                          :
             Plaintiff          :     CIVIL ACTION NO. 3:15-CV-0832
                          :     (Judge Nealon)
                          :
         v.                         :
                          :
UNITED STATES OF AMERICA,               :
             Defendant          :
                          :

## MEMORANDUM

## I.  BACKGROUND

On April 29, 2015, Plaintiff, Kim Millbrook, an inmate formerly

incarcerated in the United States Penitentiary, Lewisburg, Pennsylvania ("USP-

Lewisburg")[1], instituted the above-captioned action by filing a pro se complaint

pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. ("FTCA"),

against Defendant, the United States of America.  (Doc. 1).  Plaintiff alleges that

on March 28, 2013, Lieutenant Johnson and Correctional Officer Stevens

approached Plaintiff's cell and informed Plaintiff that he would be receiving a new

cellmate.  Id.  Plaintiff allegedly refused his new cellmate because of "a contract

hit out on [his] life by known gang affiliated members and non-members due to

[Plaintiff] being labeled a jailhouse snitch and a homosexual."  Id.  Plaintiff claims

that he informed Lieutenant Johnson that "the gangster disciples, latin kings,

---

[1]Plaintiff is currently housed in Florence Colorado ADX.

District of Colombia (D.C.) members, CMP's and bloods and anyone [Plaintiff has] been forced to cell with would and has attacked [him] and trying to hurt or kill [Plaintiff] due to a contract hit out on [him]." (Doc. 1 at 6). Lieutenant Johnson allegedly informed Plaintiff that he "did not care," and that Plaintiff "was still getting a cellmate or [he] would be extracted from the cell and placed into" ambulatory restraints[2] until he accepted a cellmate. Id. Plaintiff states that Lieutenant Johnson and Correction Officer Stevens then left the area, but Lieutenant Johnson returned later with an unknown Lieutenant and the "use of force team . . . ." Id. Plaintiff claims he was then told to "cuff up, [and] that [he] was going into ambulatory restraints" because he refused his new cellmate. (Id.). Plaintiff alleges that he complied, but claims he was "hand cuffed excessively tight around [his] wrist area . . . ." Id.

According to Plaintiff, he was then:

> taken by use of force team and unknown lieutenant and Lt. Johnson along with medical healthcare employee EMT Barth to a room on the front of F-Block 3rd floor where the use of force team began to strip [him] of [his] clothes and applied the belly chains, hand and leg restraints extremely tight to the point where [Plaintiff] could not breath and where [his] hands, legs and feet lost blood circulation in which [he] complained to

_____

[2] Ambulatory restraints are defined by Federal Bureau of Prisons policy as "approved soft and hard restraint equipment which allow the inmate to eat, drink, and take care of basic human needs without staff intervention." (Doc. 1 at 84).

> EMT Barth, Lt. Johnson and use of force team that [he] was
> having trouble breathing.

Id. EMT Barth and the Use of Force Team then allegedly told Plaintiff that "you

will learn to do as you are told and maybe this will teach you to do as you are told .

. . ." (Doc. 1 at 7).

Plaintiff alleges that he was taken by the Use of Force Team, Lieutenant

Johnson, an unknown Lieutenant, and EMT Barth to "G-Block Cell 101." Id. He

claims that he was placed in that cell, which had its window closed and a room

temperature of at least a 120 degrees. Id. Plaintiff states that he "immediately

began to sweat and gasp for air from the poor ventilation and passed out . . . ." Id.

Plaintiff claims that:

> [a]fter being inside the cell 101 G-Block for awhile [he]
> received a visit from Lt. Johnson and Lt. Knapp . . . [which is
> when Plaintiff] informed them that [he] was in severe pain from
> the restraints being to[o] tight and [he] was having trouble
> breathing due to the belly chains being to[o] tight around [his]
> waist and the poor ventilation inside the cell, also the metal pipe
> that gives off heat from the months of October [through] April
> had the temperature inside the cell [at] 120 degrees . . . .

Id. Plaintiff also alleges that he told "them [he] suffers from high blood pressure

and had passed out already inside the cell and needed to be taken out of the

restraints and the window inside the cell opened so as to let some air inside the

cell." Id. Additionally, Plaintiff claims he "told them that [he] was being falsely

accused and that they were violating BOP policy, procedure and protocol and falsifying government documents by subjecting [him] to tortuous and abusive behavior and needed to remove [him] immediately out of the cell and the restraints." Id. Plaintiff alleges that "Lt. Knapp and Lt. Johnson told [him] that until [he] did what they told [him] to do which is to except (sic) a violent cellmate [he] would stay in restraints inside cell 101 G-Block . . . ." Id.

Plaintiff claims that he then "received another visit from A.W. Wilson," at which time he claims to have "informed [A.W. Wilson] that [Plaintiff's] life, health and safety are and is in 'imminent danger' at all times at Lewisburg SMU program due to [Plaintiff] being labeled a jailhouse 'snitch' and a homosexual." Id. He also alleges that he informed A.W. Wilson of the "contract hit out on [Plaintiff's] life by known gang affiliated inmates . . . and also non-members." Id. Plaintiff states that he told A.W. Wilson that he "was brought up on false allegations by Lt. Johnson and use of force team and placed in ambulatory restraints unjustly, that due to the restraints being applied to[o] tight Plaintiff was having trouble breathing, also the restraints were cutting off all blood circulation in [his] arms, hands, legs and feet . . . ." Id. Plaintiff claims he also informed A.W. Wilson that he was "in severe pain and that the room was to[o] 'hot,' and also [his] feet, fingers, hands, and wrists were swollen and turned blue." Id. Plaintiff alleges that

he also told A.W. Wilson that:

> Lt. Johnson and C.O. Stevens [were] trying to force a violent
> inmate in the cell with [Plaintiff] on F-Block and [he] refused
> the inmate to be celled with [him] out of fear for [his] safety
> due to [him] being attacked and physically and sexually
> assaulted by violent inmates and staff officials while at
> Lewisburg SMU program and that [he has] requested protective
> custody and to be transferred to a safer prison facility . . . .

(Doc. 1, at 9-10).

According to Plaintiff, A.W. Wilson stated "that he would not help
[Plaintiff] because [he] told [A.W. Wilson] to have [Plaintiff] removed from the
ambulatory restraints and from the cell that was 120 degrees . . . ." Id. Plaintiff
alleges that A.W. Wilson then stated that Plaintiff "needed to remember that [he]
was in Lewisburg and we do what we want to around here, that he does not believe
his staff officials would make up fake incident reports against [Plaintiff] and even
if it was true, who do you think I'm going to believe." Id.  According to Plaintiff,
A.W. Wilson then "said that he would believe the staff before he would believe
[Plaintiff] anyday." Id.  He claims that A.W. Wilson also stated that he knew who
Plaintiff "was and for [him] to stop filing lawsuits and admin. remedies on staff
and inmates here at Lewisburg, and from now on A.W. Wilson was going to be
keeping a close eye on" Plaintiff. Id. at 10-11. Plaintiff claims that this interaction
was witnessed by "an inmate 'Black' whom was forced into the cell with [Plaintiff]

and told by Lt. Knapp and A.W. Wilson that Plaintiff was 'a rat' and to beat [Plaintiff] up." Id.

Plaintiff also claims that on the evening of March 28, 2013, cell 101 on G-Block was "infested with bugs like roaches, and rodents like rats and mice . . . ." Id. Also during that time, Plaintiff states that "the heat inside the room was 120 degrees . . . without any air flow . . . [and he was] still in extremely tight leg and hand restraints, and belly chain around waist [which] cut[] off [his] air supply to the point where Plaintiff passed out and had to be revived by a EMT-George on evening watch . . . ." Id. Plaintiff alleges that EMT-George told him "in front of a Lt. Carwascillo [that he] should've let [Plaintiff] die for all the trouble [he has] caused around here filing all the lawsuits against Lewisburg staff like EMT-Potter, EMT-Walls, and Doctor Pigos who I work with and are good friends of mine . . . ." Id. Plaintiff claims that he "told EMT-George and Lt. Carwascillo that [he] needed to be taken out of ambulatory restraints, . . . the window inside the cell needed to be opened to let some air flow into the room as to cool the room due to the extreme heat and to unchain the belly chain from around [Plaintiff's] waist and chest area . . . ." Id. He states that these requests were refused. Id. Instead, Plaintiff alleges, "EMT-George began pulling on [Plaintiff's] wrists and hands to inflict severe pain and in a hurtful manner . . . ." Id.

Also during the evening of March 28, 2013, Plaintiff alleges that "EMT-Potter came in with Lt. Dawkins into cell 101 G-Block and Plaintiff informed them to remove the leg and hand restraints also the belly chain so that [he] could breath but they refused." (Doc. 1 at 11). According to Plaintiff, "Lt. Dawkins began acting like he was going to loosen the restraints but instead tightened them around [Plaintiff's] hands and wrists thus inflicting severe pain . . . ." Id. Plaintiff was removed from his restraints on March 29, 2013. Id. at 13.

Plaintiff claims that he "suffered from permanent nerve damage from these abusive attacks like tendinitis, permanent scarring around wrist and ankles, numbness, mental and emotional scarring for life and in constant pain at all times, suffering from symptoms of arthritis and joint pain and taking medication called Meloxicam 7.5 mg, also suffering symptoms from PTSD (post traumatic stress disorder) like nightmares, panic attacks, paranoia, suicidal tendencies . . . ." Id.

By Memorandum and Order dated September 16, 2016, this Court granted, in part, and denied, in part, Defendant's motion for summary judgment. (Docs. 23, 24). Specifically, this Court granted summary judgment with respect to Plaintiff's claims seeking monetary damages for any due process claim arising out of his disciplinary proceeding that has not been overturned or invalidated and the intentional tort claims advanced against EMT Barth and EMT George. Id.

Defendant's motion for summary judgment was denied as to Plaintiff's negligence claims and remaining intentional tort claims. Id. In particular, the Court found the following facts in dispute: 1) whether Plaintiff became disruptive in his cell on March 28, 2013; 2) whether Plaintiff was medically assessed and found to have no injuries after being removed from his cell; and 3) whether the ambulatory restraints placed on Plaintiff were excessively tight and caused Plaintiff to suffer injuries. The parties were then permitted thirty (30) days within which to file any additional dispositive motions. Id.

On October 12, 2016, Defendant filed a second motion for summary judgment. (Doc. 26). On October 26, 2016, Defendant filed a statement of facts, and brief in support. (Docs. 35-36). The motion is fully briefed and is ripe for disposition. For the reasons stated below, Defendant's motion will be granted.

## II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a) "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no genuine issue of material fact."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in
original).  Once such a showing has been made, the non-moving party must offer
specific facts contradicting those averred by the movant to establish a genuine
issue of material fact.  Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990).
Therefore, the non-moving party may not oppose summary judgment simply on the
basis of the pleadings, or on conclusory statements that a factual issue exists.
Anderson, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely
disputed must support the assertion by citing to particular parts of materials in the
record ... or showing that the materials cited do not establish the absence or
presence of a genuine dispute, or that an adverse party cannot produce admissible
evidence to support the fact."  Fed.R.Civ.P. 56(c)(1)(A)-(B).  In evaluating
whether summary judgment should be granted, "[t]he court need consider only the
cited materials, but it may consider other materials in the record." Fed.R.Civ.P.
56(c)(3).  "Inferences should be drawn in the light most favorable to the
non-moving party, and where the non-moving party's evidence contradicts the
movant's, then the non-movant's must be taken as true."  Big Apple BMW, Inc. v.
BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S.
912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

Id. (internal quotations, citations, and alterations omitted).

III. **STATEMENT OF FACTS**

**A. Cell Extraction**

From the pleadings, declarations and exhibits submitted therewith, the following facts can be ascertained as undisputed.

On March 28, 2013, at approximately 12:55 p.m., at the direction of the Acting Warden, the Use of Force team was assembled as a result of Millbrook engaging in disruptive behavior and refusing staff orders, in the Special Management Unit ("SMU") on F Block. (Doc. 35-1, Video Recording).

Specifically, at 12:15 p.m., Millbrook refused to accept another inmate into his cell, and began making threatening statements, both to staff and the other inmate. Id. Millbrook stated that he "would cut off anyone's head that comes in this cell". Id. The Use of Force team then assembled in front of Millbrook's cell and confrontation avoidance procedures were initiated with positive results. Id.

Millbrook was then visually searched, metal detected, placed in ambulatory restraints at 1:10 p.m. and then escorted to a new cell where he was medically assessed. Id. After Millbrook was placed into a cell, a video recorded debriefing of the staff members involved in the use of force and application of restraints on Millbrook was conducted, in which it was stated that Plaintiff voluntarily exited his cell and submitted to cuffs. Id. Plaintiff was then removed from the cell and escorted to the third floor law library area. Id. Once at the law library area, Plaintiff was visually searched, metal detected, medically assessed, given new clothes and placed into ambulatory restraints. Id. After applying the ambulatory restraints, responding staff escorted Millbrook to a new cell where he was medically assessed. Id. During the debriefing, the paramedic who conducted the medical assessment on Millbrook stated that Millbrook had sustained no injuries and had adequate circulation. Id. The debriefing concluded at 1:12 p.m. Id. Plaintiff remained in ambulatory restraints from 1:10 p.m. on March 28, 2013, until

8:00 a.m. on March 29, 2013.  (Doc. 35-1 at 30-32).

Beginning at 1:10 p.m., restraint checks were conducted by a lieutenant every two hours. (Doc. 35-1 at 30-32, Two-Hour Lieutenant Restraints Check Form).  On March 28, 2013, restraint checks were conducted on Millbrook at 1:10 p.m., 2:00 p.m., 4:00 p.m., 6:00 p.m., 8:00 p.m., and 10:00 p.m.  Id. On March 29, 2013, restraint checks were conducted at 12:00 a.m., 2:00 a.m., 4:00 a.m., 6:00 a.m/, and 8:00 a.m.  Id. Additionally, restraint reviews were conducted by health services twice during each eight-hour shift. (See Doc.  35-1 at 34-35, Bureau of Prisons Health Services Restraint Review Form).

On March 28, 2013, at 1:17 p.m., EMT Matthew Barth assessed Plaintiff in relation to his placement into ambulatory restraints.  (Doc. 14-1 at 27).  He noted that Millbrook "Verbalized no medical complaints. No signs of trauma noted. I/M placed into ambulatory restraints. Good distal pulses and capillary refill in all extremities."  Id.  At 4:00 p.m., EMT George conducted a clinical encounter with Plaintiff.  (Doc. 1, p. 27).  He noted "No Significant Findings/No Apparent Distress. Restraint check performed, no complaints offered 0/10 pain. Strong pulses bilateral. Cap refill less than 2 seconds. Normal movements of fingers and toes."  Id.  EMT George further noted that "education provided on non-manipulation of the restraints, the inmate refused to follow directions stating 'I'm

12

using this for my lawsuit, I'm taking this to the Supreme Court'." Id.

At 8:00 p.m., EMT Potter performed a clinical encounter. (Id. at p. 24). He

noted the following:

**Appearance**
Yes: Appears Well, NAD, WD/WN, Alert and Oriented x3, Disheveled
No: Lethargic, Obtunded, Stuporous, Appears in Pain in Distress, Unkempt,
    Acutely Ill

> Verbalized no medical complaints. No signs of trauma.
> No signs of dehydration noted. I/M lying prone on bed
> with his wrist restraints under him. This causes the
> restraints to become tight at the wrists and forces the
> restraints up the forearms. I/M's hands swollen
> secondary to this. Restraints moved to the wrists.
> Restraints moved freely. I/M advised to lie supine and
> keep the restraints at the wrists. Good distal pulses and
> CAP refill in all Extrem. after restraints were moved to
> the wrists. I/M destroyed his pants exposing his genitalia.
> The Ops Lt offered to replace the pants and I/M states
> "Fuck You, I'll just rip them off to. If you gotta keep
> coming in here and looking at me, I'll give you
> something to look at."

Id. At 12:01 a.m. on March 29, 2013, EMT Potter performed another clinical

encounter. (Id. at p. 21). His exam noted the following:

**Appearance**
Yes: Appears Well, NAD, WD/WN, Alert and Oriented x3, Disheveled
No. Lethargic, Obtunded, Stuporous, Appears in Pain in Distress, Unkempt,
    Acutely Ill

> Upon entry to the cell, I/M was sitting on desk with his
> genitalia exposed. I/M had to be ordered to cover up.
> Verbalized no medical complaints. No signs of trauma or

dehydration noted. Good distal pulses and CAP refill in
all Extrem.  I/M refusing to keep restraints at wrist.
Restraints moved to the wrists. Restraints moved freely.
I/M moved hands, finders and feet freely.  I/M is talking
in full sentences. Ops Lt offered I/M a new pair of pants.
The I/M refused.  Ops Lt. tried to talk to I/M about why
he was in restraints. I/M stated "You know me, you know
what I"m all about and you better make this right."

<u>Id</u>. Millbrook was advised of the dangers of manipulating the restraints to include:

Abrasions and other open wounds, infections, circulatory compromise and

swelling, nerve damage and loss of limb.  <u>Id</u>.  No response from inmate.  <u>Id</u>.

During the approximate 24 hour period that Plaintiff was in ambulatory

restraints, he continued to be disruptive and  defiant.  (Doc. 35-1 at 30-32, Two-

Hour Lieutenant Restraints Check Form).  At 8:00 a.m., Plaintiff was released from

the ambulatory restraints.  <u>Id</u>.

On March 28, 2013, a Report of Incident was completed by "Acting

Warden, D. Wilson."  (<u>Id</u>. at pp. 19-23).  Plaintiff was charged with violating Code

203 for threatening another with bodily harm and Code 307 for refusing an order

when he failed to voluntarily take a cellmate or submit to restraints to allow a

cellmate to enter his cell.[3]  (Doc. 14, p. 4); (Doc. 20, p. 5).  On April 22, 2013,

Plaintiff appeared before the Disciplinary Hearing Officer.  (Doc. 14, p. 5); (Doc.

---

[3]  28 C.F.R. § 541.3 contains a listing of the various prohibited acts within
the Bureau of Prisons system.

20, p. 5). The Disciplinary Hearing Officer found Plaintiff guilty of threatening

another with bodily harm. (Doc. 14, p. 5); (Doc. 14-1, pp. 6, 36); (Doc. 20, p. 6).

Plaintiff's sanctions included disallowance of twenty-seven (27) days good

conduct time. Id. This disciplinary action has not been overturned. Id.

On May 29, 2013, Millbrook appeared for a sick call/triage encounter with

F. Alama, MLP. (Doc. 21 at 4-6). Plaintiff presented with complaints of pain in

both wrists "due to previous ambulatory restraints." Id. He also complained of an

aching pain in his right wrist that reached level four (4) of ten (10). Id. Alama

noted that Plaintiff had an anxious affect, and appeared "well, NAD, WD/WM,

alert and oriented x 3," but also appeared in pain. Id. Alama found that Plaintiff's

"wrist/hand/fingers" had full range of motion in his wrists and were symmetric. Id.

Alama also noted that they were tender. Id. Alama did not observe swelling,

erythema or decreased range of active motion in Plaintiff's "wrist/hand/ fingers."

Id. Plaintiff exhibited wrist flexion, extension and pronation, as well as thumb

extension. Id. Alama assessed Plaintiff as having a wrist "sprain and strain" that

was "Temporary/Acute." Id. Alama ordered that Plaintiff be prescribed

Meloxicam Tablets, that he could take two (2) times a day for "30 day(s)–Take 1

tablet by mouth daily # 30." Id. Plaintiff was instructed to follow up at sick call as

needed and to return to sick call if his condition did not improve. Id. Alama also

noted that Plaintiff was counseled as to his access to care, to which Plaintiff verbalized his understanding.  Id.

On July 9, 2013, Alama performed an "Admin Note encounter" with Plaintiff.  Id.  Plaintiff requested a refill of his "Meloxicam" prescription.  Id.  Alama ordered that Plaintiff receive a refill of his Meloxicam "7.5 MG Tab" and that he take "one tablet by mouth each day x 30 day(s)–#30."  Id.

### B.  Condition of Cell

USP-Lewisburg has established a Pest Control Management Program.  (Doc. 35-1 at 7-14, Pest Control Management).  The program includes monthly inspections to monitor the effectiveness of the program.  (doc. 35-1 at 16-27, Monthly Safety and Environmental Inspection Report).   Any infestations or concerns are noted on the monthly inspection report.  Id.  An area will be treated based on the following: an identified need following a monthly inspection, or; a verbal or written request from a staff member or inmate.  Id.  Treatment will be conducted after conditions have been verified and determined to warrant treatment. Id.  No discrepancies are noted for G Block from January 2013 through May 2013 except for April, 2013 when it was noted that the basement area of the unit needed to be cleaned. Id.

American Correctional Association (ACA) sets forth ventilation standards

requirements in order to be ACA certified. (Doc. 35-1 at 4, Declaration of R. Hicks, USP-Lewisburg Safety Manager). Specifically, accreditation occurs every three years and had been done in 2010. Id. The accreditation completed most closely to the date of Millbrook's allegation occurred in September 2013. (Doc. 35-1 at 28, Accreditation). On September 3-4, 2013, a representative sampling of ventilation was conducted throughout the housing units, officer stations, and dining areas within USP-Lewisburg. Id. Ventilation rates met or exceeded the ACA requirements. Id.

## IV.  DISCUSSION

The FTCA provides a remedy in damages for the simple negligence of employees of the United States. See United States v. Muniz, 374 U.S. 150, 150 (1963). Under the FTCA, sovereign immunity is waived against persons suing the federal government for the commission of various torts. See Simon v. United States, 341 F. 3d 193, 200 (3d Cir. 2003).


A plaintiff pursuing an FTCA claim must show: (1) that a duty was owed to him by a defendant; (2) a negligent breach of said duty; and (3) that the negligent breach was the proximate cause of the plaintiff's injury/loss. Mahler v. United States, 196 F. Supp. 362, 364 (W.D. Pa. 1961). The only proper Defendant for

purposes of an FTCA claim is the United States of America.  See 28 U.S.C. § 2679(d).  Except for limited circumstances, an FTCA claim in federal court is limited to recovery of the sum certain amount requested in the underlying administrative claim.[4]  See McMichael v. United States, 856 F.2d 1026, 1035 (8th Cir. 1988).

It is well-settled that a federal district court addressing an FTCA action must apply the law of the state, in this case Pennsylvania, in which the alleged tortious conduct occurred.  28 U.S.C. § 1346(b) (1996); Toole v. United States, 588 F.2d 403, 406 (3d Cir. 1978); O'Neal v. Department of Army, 852 F. Supp. 327, 334-35 (M.D. Pa. 1994); Turner v. Miller, 679 F. Supp. 441, 443 (M.D. Pa. 1987).  However, in cases such as this which involve federal prisoners, it has been recognized that the government's duty of care is one of ordinary diligence.  See 18 U.S.C. § 4042; Turner, 679 F. Supp. at 443.  The applicable law with respect to the burden and quantum of proof under the FTCA remains that of the state in which the alleged tortious conduct occurred.  Hossic v. United States, 682 F. Supp. 23, 25 (M.D. Pa. 1987).  Under Pennsylvania law, a plaintiff is required to show that the defendant's negligence was the proximate cause of his injury by a preponderance

_____

[4]Since the only relief available under the FTCA is for compensatory damages, Plaintiff's requests for injunctive relief will be dismissed without prejudice.

of the evidence.  <u>Baum v. United States</u>, 541 F. Supp. 1349, 1351 (M.D. Pa. 1982).[5]

In addition to his claims of negligence, Plaintiff also advances claims of assault and battery.  (Doc. 1, pp. 2, 6-9, 12).  "As the Pennsylvania Superior court explained in <u>Cohen v. Lit Bros.</u>, 166 Pa. Super. 206, 70 A.2d 419, 421 (Pa. Super. Ct. 1950), 'assault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person.'"  <u>Banks v. Harrison</u>, 2015 U.S. Dist. LEXIS 111465, at *19 (M.D. Pa. 2015) (Mannion, J.) (quoting <u>Cohen</u>, 166 Pa. Super. at 209); <u>see</u> <u>Renk v. City of Pittsburgh</u>, 537 Pa. 68, 76 (1994) (citing <u>Cohen</u>, 166 Pa. Super. at 209); <u>see</u> <u>also</u> <u>Zimmerman v. Schaeffer</u>, 654 F. Supp. 2d 226, 255 (M.D. Pa. 2009) (Rambo, J.) ("Under Pennsylvania law, an assault occurs when one acts with the intent to place another in reasonable and immediate apprehension of harmful or offensive contact, and that act does cause such apprehension.  A battery is an intentional offensive bodily contact.") (internal citations omitted).  Additionally, the Pennsylvania Superior Court has stated that "[t]hreatening words alone are insufficient to put a person in reasonable

_____

[5]Pennsylvania law defines proximate cause as causation which was a substantial factor in bringing about the injury.  <u>Hamil v. Bashline</u>, 392 A.2d 1280, 1284 (Pa. 1978).

apprehension of physical injury or offensive touching; rather the actor must be in a position to carry out the threat immediately and must take some affirmative action to do so." Paves v. Corson, 765 A.2d 1128, 1138 (Pa. Super. Ct. 2000) (citing Gen. Machine Corp. v. Feldman, 507 A.2d 831, 833-34 (Pa. Super. Ct. 1986)), rev'd in part on other grounds, 569 Pa. 171 (2002)); see Patel v. Patel, 2015 U.S. Dist. LEXIS 149571, at *7 (E.D. Pa. 2015) ("Words alone, no matter how threatening, do not constitute an assault . . . ."); Brillhart v. Sharp, 2008 U.S. Dist. LEXIS 55624, at *19 (M.D. Pa. 2008) (Jones, J.) (citing Cucinotti v. Ortmann, 399 Pa. 26 (Pa. 1960); Paves, 765 A.2d at 1138; Sides, 648 A.2d at 796).

Assault and battery are intentional torts in Pennsylvania. See Cooper ex rel. Cooper v. Lankenau Hosp., 616 Pa. 550, 563 (2012) (citing Valles v. Albert Einstein Med. Ctr., 569 Pa. 542 (2002)); Am. Nat'l Prop. & Casualty Cos., 93 A.3d 880, 886-87 (Pa. Super. Ct. 2014). "The FTCA waives the United States' sovereign immunity for certain intentional torts committed by law enforcement officers." Millbrook v. U.S., 133 S. Ct. 1441, 1444 (2013). The relevant portion of the Act, 28 U.S.C. § 2680(h), which is known as the "intentional torts exception," states:

> The provisions of this chapter and section 1346(b) of this title shall not apply to– . . . .
>
> (h) Any claim arising out of assault, battery, false

> imprisonment, false arrest, malicious prosecution, abuse
> of process, libel, slander, misrepresentation, deceit, or
> interference with contract rights: Provided, That, with
> regard to acts or omissions of investigative or law
> enforcement officers of the United States Government,
> the provisions of this chapter and section 1346(b) of this
> title shall apply to any claim arising . . . out of assault,
> battery, false imprisonment, false arrest, abuse of
> process, or malicious prosecution.

28 U.S.C. § 2680(h). The Supreme Court of the United States held that "the waiver effected by the law enforcement proviso extends to acts or omissions of law enforcement officers that arise within the scope of their employment, regardless of whether the officers are engaged in investigative or law enforcement activity, or are executing a search, seizing evidence, or making an arrest." Millbrook, 133 S. Ct. at 1446.

As is revealed in the undisputed video evidence[6] in the instant action, at the acting Warden's direction, the Use of Force Team was assembled to remove Millbrook from his cell after he became disruptive and refused to accept a

---

[6]When videotape of a use of force refutes an inmate's assertion that the defendant used excessive force, or when the video shows that an inmate did not suffer any physical distress, and a medical report indicates that he had no visible swelling or injuries, the court should conclude that no reasonable finder of fact could view the video of the incident and determine that the defendants acted maliciously and sadistically and may enter summary judgment. Tindell v. Beard, 351 F.App'x 591, 596 (3d Cir. 2009).

cellmate. The video evidence clearly depicts the uneventful removal of Millbrook from the cell and being escorted to the law library area, where he was visually searched, metal detected, and placed in new clothes and ambulatory restraints. Plaintiff was then medically assessed as having not injuries, and was then escorted to a new cell. At no time did Plaintiff state that the hand restraints were too tight, or that he could not breath.

Additionally, the undisputed medical record plainly shows that Plaintiff was assessed by medical staff for circulation, or other medical concerns, and none were apparent. Although, the record does demonstrate that during one of the wellness checks, staff noted that Plaintiff was manipulating the restraints, so as to cause swelling of the wrists. Plaintiff, however, refused to be counseled on the possible consequences of failing to comply with accepting medical treatment and the medical advice of moving his extremities. Additionally, aside from Plaintiff's conclusory allegation that Lieutenant Dowkus tightened Plaintiff's restraints (see Doc. 1, complaint), there is no evidence of record demonstrating that Defendant Dowkus, or any other staff member, at any time, adjusted Millbrook's restraints. Finally, the medical record is devoid of any injury directly related to Defendant applying the restraints too tight. In fact, the Court finds to the contrary. Plaintiff was continually counseled on the importance of keeping the restraints at the base

of the wrist and disregarded any counseling by forcing the restraints up his forearms. To the extent that Plaintiff presented at sick call on May 29, 2013, with complaints of wrist tenderness, the Court finds that, not only is his injury too remote from its causal agent to satisfy tort law's proximate cause requirement, but any injury resulted from Plaintiff's own actions in assuming the risk of forcing the restraints up his forearms.

While Plaintiff has submitted a brief in opposition to Defendant's motion and statement of material facts, in which he generally "disputes" all factual statements made by Defendant, Plaintiff fails to point to any supporting record evidence that establishes a factual dispute. See Fed. R. Civ. P. 56(e); Doeblers' Pa. Hybrids, Inc. v. Doebler, 442 F.3d 812, 820, n.8 (3d Cir. 2006) (recognizing it is not the court's duty to "scour the record" in an attempt to find evidence to support the nonmoving party's denials and noting "'[j]udges are not like pigs, hunting for truffles buried in' the record.")(quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)). Thus, Plaintiff has not proven by a preponderance of the evidence that his alleged injuries were the result of any negligence, or assault and battery, on the part of the United States.

Moreover, a thorough review of all monthly pest inspection reports showed no discrepancies for G Block from January 2013 through May 2013 except for

April, 2013 when it was noted that the basement area of the unit needed to be cleaned. Further, ventilation rates met or exceeded the ACA requirements in the cell Millbrook complained about. Thus, the record reflects that Millbrook's claim of negligent failure to protect regarding the conditions of his cell is without merit.

Finally, Millbrook claims that Defendant was negligent in "forcing' Plaintiff to accept a cellmate, claiming he has "a contract out on [his] life by known gang affiliated members and non-members due to [Plaintiff] being labeled a jailhouse snitch and a homo-sexual." (Doc. 1).

The United States is only liable under the FTCA for conduct by government employees while acting within their scope of employment. Matsko v. United States, 372 F.3d 556, 559 (3d Cir. 2004). 18 U.S.C. §4042 imposes a general duty of care on the BOP to safeguard its prisoners. However, the regulation does not dictate the manner by which that duty is to be fulfilled. See Cohen v. United States, 151 F.3d 1338, 1343 (11th Cir. 1998). Hence, the BOP has the ability to exercise its judgment on how its duty under §4042 is to be fulfilled.

A significant limitation on FTCA claims is imposed by 28 U.S.C. §2680(a), which provides that liability may not be premised on a claim against a government employee which is "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty."

"Conduct is not discretionary unless it involves an element of judgment or choice." <u>Koch v. United States</u>, 814 F. Supp. 1221, 1227 (M.D. Pa. 1993). In <u>Berkovitz v. United States</u>, 486 U.S. 531 (1988), the United States Supreme Court adopted a two part inquiry with respect to §2680(a). First, a court must decide if "a federal statute, regulation or policy specifically prescribes a course of action for an employee to follow." <u>Id</u>. at 536. If so, "the employee has no rightful option but to adhere to the directive." <u>Id</u>. Federal employees such as correctional officers employed by the Bureau of Prisons simply "do not have discretion to violate mandatory requirements" or constitutional rights. <u>Koch</u>, 814 F. Supp. at 1228.

With respect to the first prong, while the BOP imposes a duty upon its employees to use reasonable care and ordinary diligence to protect the safety of inmates, there is no indication that there was a specific federal statute or regulation or policy which required the BOP to take a particular course of action to ensure that Plaintiff was not housed with a gang member. <u>See Donaldson v. United States</u>, 281 Fed. Appx. 75 (3d Cir. 2008). The "BOP retains sufficient discretion in the means it may use to fulfill" its duty of protecting prisoners from being assaulted by other inmates. <u>Id</u>. at 77.

There have been no facts presented which would support a claim that Plaintiff should not have been assigned a cell mate while at USP-Lewisburg. It has

not been suggested that the cell mate at issue had any prior history with Millbrook or were listed as separtees from one another. The assignment of cell mates clearly is a discretionary decision. As such, such decision making fails within the discretionary function exception.

## V.    <u>**CONCLUSION**</u>

Based on the foregoing, Defendant's second motion for summary judgment, (Doc. 26), will be granted.

A separate Order will be issued.

**Date**: March 31, 2018                                  ___/s/ William J. Nealon_____
                                                                          **United States District Judge**

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

KIM MILLBROOK,              :
           Plaintiff            :     CIVIL ACTION NO. 3:15-CV-0832
                                   :     (Judge Nealon)
       v.                           :
                                     :
UNITED STATES OF AMERICA,  :
           Defendant       :
                                     :

## <u>ORDER</u>

**AND NOW, THIS 31ˢᵗ DAY OF MARCH, 2018**, for the reasons set forth

in the accompanying Memorandum, **IT IS HEREBY ORDERED THAT:**

1.     Defendant's second motion for summary judgment (Doc. 26) is **GRANTED**. The Clerk of Court is directed to enter judgment in favor of Defendant, United States of America and against Plaintiff on all claims.

2.     The Clerk of Court is directed to **CLOSE** this case.

3.     Any appeal from this Order will be deemed frivolous, without probable cause and not taken in good faith.

                               /s/ William J. Nealon    
                             **United States District Judge**